[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 I. Statement of Case
This is an administrative appeal from the September 6, 2000 final decision of the Commissioner of the Connecticut Department of Environmental Protection (DEP). In the final decision, DEP ordered Robert Gluck (Gluck) and the plaintiff; Providence Worcester Railroad Company (PW), to make numerous specified repairs to an earthen embankment dam located in Plainfield, Connecticut pursuant to General Statutes §22a-402.[1] This appeal by PW is brought pursuant to General Statutes §§ 22a-408 and 4-183.
 II. Procedural History
The DEP through order dated May 11, 1998 found that PW and Gluck were owners or had control of portions of the Packer's Pond Dam (the dam) located in Plainfield, Connecticut. (Return of Record [ROR], DEP Exhibit 1 and 2). The order indicated that the "dam is in an unsafe condition" and "might, by breaking away, cause loss of life or property damage." (ROR, DEP Exhibit 2, p. 1). PW and Gluck were instructed to undertake corrective action to restore the dam to a safe condition.
In accordance with General Statutes § 22a-408, PW and Gluck requested an administrative hearing to contest the May 11, 1998 order. Hearing officers were assigned to take evidence and prepare a decision.[2] The hearing took place over the course of seventeen days. The parties presented sworn testimony of witnesses and a voluminous number of exhibits. The parties also filed post-hearing briefs and reply briefs. The hearing officer (DEP HO) issued a final decision dated September 6, 2000. This decision included thirty findings of fact and numerous conclusions of law. In summary, CT Page 10230 the DEP HO determined in relevant part that "[t]he evidence amply demonstrates that the respondents are either owners or in control of the dam and that the dam is in an unsafe condition. The actions required by the Orders are necessary to restore the dam to a safe condition." (Final Decision, p. 2). In the final decision, the DEP HO apportioned the responsibility for repairing the dam among Gluck and PW based upon their respective interests and boundaries.
PW commenced this administrative appeal in the superior court through complaint filed in the judicial district of New Britain on October 23, 2000. This appeal is brought pursuant to General Statutes §§ 22a-408 and 4-183.
 III. Jurisdiction
A. Aggrievement
General Statutes § 22a-408 provides that "[a]n appeal may be taken from any decision of the commissioner in accordance with the provisions of section 4-183. . . ." General Statutes § 4-183 (a) provides in relevant part that "[a] person . . . who is aggrieved by a final decision may appeal to the Superior Court. . . ." "To be an aggrieved person, one must be affected directly or in relation to a specific, personal and legal interest in the subject matter of the decision, as distinguished from a general interest such as is the concern of all members of the community, and the appellant must be specially and injuriously affected as to property or other legal rights." Smith v. Planning Zoning Board,203 Conn. 317, 321 (1987).
In this appeal, DEP has not challenged aggrievement. This court finds that the plaintiffs are aggrieved.
B. Timeliness of Appeal
General Statutes § 4-183 (c) provides, in relevant part: "Within forty-five days after mailing of the final decision under § 4-180
. . . a person appealing . . . shall serve a copy of the appeal on the agency that rendered the final decision . . . and file the appeal with the clerk of the superior court. . . ."
The final decision is dated September 6, 2000. The plaintiff filed its appeal in the Superior Court, judicial district of New Britain on October 23, 2000. DEP has not raised a jurisdictional defect. Thus, this court finds the appeal to be timely.
 IV. Standard of Review
CT Page 10231
"Judicial review of [an administrative agency's] action is governed by the [Uniform Administrative Procedures Act (UAPA)] . . . and the scope of that review is very restricted. . . ." (Citations omitted; internal quotation marks omitted.) Cadlerock Properties v. Commissioner,253 Conn. 661, 668 (2000), U.S. cert. denied, 121 S.Ct. 1089 (2001). "The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." General Statutes § 4-183 (j).
 Judicial review of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . [T]he trial court may [not] retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact. Our ultimate duty is to determine, in view of all the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . The substantial evidence rule governs judicial review of administrative fact-finding under the UAPA. General Statutes § 4-183 (j)(5) and (6). An administrative finding is supported by substantial evidence if the record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . The substantial evidence rule imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and to provide a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action. . . . [S]ubstantial evidence . . . is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. . . . CT Page 10232
(Citations omitted; internal quotation marks omitted.) CadlerockProperties v. Commissioner, supra, 253 Conn. 676-77.
The court must search the entire record to determine whether substantial evidence exists to support the agency's findings of fact, and whether the conclusions drawn from those facts are reasonable. Dolgnerv. Alander, 237 Conn. 272, 283 (1996).
 Judicial review of the conclusions of law reached administratively is also limited. The court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . . Although the interpretation of statutes is ultimately a question of law . . . it is the well established practice of this court to accord great deference to the construction given [a] statute by the agency charged with its enforcement. . . . Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts.
(Citations omitted; internal quotation marks omitted.) CadlerockProperties v. Commissioner, supra, 253 Conn. 669.
 V. Discussion Plaintiff's Claims of Error
The plaintiff has briefed numerous claims of error: (1) Gluck is exclusively obligated to correct any deficiencies in the dam; (2) PW neither owns nor has control of the dam; (3) the DEP failed to demonstrate that the dam is in an unsafe condition; (4) the final decision incorrectly apportioned responsibility for repairs based upon PW's easement boundary and ignores Gluck's pre-existing obligations to repair the dam. (Plaintiffs February 2, 2001 Brief; Plaintiffs April 6, 2001 Reply Brief).[3]
The final decision contains thirty separate findings of fact, which include the following relevant portions:
 The Dam
CT Page 10233
1. Packer's Pond Dam is located on Mill Brook in Plainfield, Connecticut. The dam was constructed circa 1811 to impound water to provide power to downstream mills. The dam is no longer used for that purpose.
2. The dam is an earthen embankment, approximately 325 feet in length, and impounds 450 acre-feet of water. The top of the dam varies in width, averaging between twelve and fifteen feet.
 * * * Property Interests Related to the Dam
8. On July 10, 1967, John and Mary Gluck quitclaimed the 265 acres along with other additional interests in land to their son, Robert Gluck, a dany farmer. Gluck does not use the water impounded by the dam of the water flowing from the dam for any purpose. In 1986, he registered the dam with the DEP as required by General Statues § 22a-409.
9. PW is the successor in title to the interest in the railroad corridor that intersects and passes over the dam including the embankment that ties into the downstream portion of the dam. The succession of interests that conclude with those held by PW arose due to enabling legislation enacted in the 1840s that provided for the establishment of several railroad companies to provide transportation services throughout the state.
10. These railroad companies were empowered to purchase and receive real estate, and, if necessary, to take property along a planned and approved route for their railway in accordance with certain assessment and condemnation procedures.[4]
11. The charters for the predecessors in interest to PW authorized the railroad companies to take as much land as was necessary for the purposes of cutting and embankments, necessary turnouts, obtaining stone and gravel, and constructing their railroads. The charters also empowered the companies "to purchase, receive and hold such real estate as may be necessary and convenient in accomplishing the object for which [the] incorporation [was] granted. . . ." and "to enter upon and use all such lands and real estate as may be necessary . . ."[5]
12. The enabling statutes required railroad companies to "erect and maintain good and sufficient fences on both sides of their railroads, throughout their whole extent. . . ."[6] and, where necessary, to "erect and maintain a gate across the railroad" at turnpike, highway or street crossings.[7]
CT Page 10234
13. The statutes provided that "commissioners of railroads"[8] were to "advise and recommend the making of such repairs upon any railroad, railroad bridge, or other property belonging to the same as they shall deem necessary to the public safety. . . ."[9]
14. In 1853, land held by Daniel Packer (a predecessor in title to Gluck) was the subject of an assessment proceeding initiated by the Hartford, Providence and Fishkill Railroad Company (predecessor in interest to PW), which assessment was duly recorded in the records of the Connecticut Superior Court. That portion of the railway corridor that intersects and passes over the dam, including the aforementioned embankment, was the subject of those assessment proceedings and taken by condemnation from Daniel Packer by this predecessor in interest to PW.
15. From time to time, PW's predecessor's in interest prepared evaluation maps that defined the boundaries of railroad corridors from one point to another. These maps identified a "center line" of the corridor which was physically marked by monuments along the railway. The width of a corridor was shown as so many feet on either side of the center line as determined from the language used in the condemnation assessment documentation or in deeds of conveyance.
16. Through the use of the historical evaluation maps and the assessment documentation, a survey (Conklin survey . . .) dated March 27, 1998 was prepared "to depict or note the position of the existing features and topography with respect to the existing dam structure and existing railroad tracks . . ."[10]
17. Another survey, dated October 16, 1998, (Meehan survey . . .) was "prepared to depict the relation of the dam structures to the railroad layout."[11] All parties agreed that the boundaries depicted on the Conklin and Meehan surveys are "substantially correct."
18. The following portions of the dam are within those boundaries shown on the surveys: (1) the east downstream spillway training wall; (2) the west downstream spillway training wall; (3) a portion of the spillway including the base or toe and spillway outlet channel; (4) the east and west dam embankments; (5) a west embankment lateral training wall; and (6) a portion of the sluiceway or sluice structure.
 * * * Condition of the Dam
CT Page 10235
20. In its Phase I Inspection Report issued December, 1980, the Army Corps of Engineers, in accordance with recommended guidelines for safety inspection of dams, and taking into account its height and impound capacity, characterized the dam as "Small". The Corps further classified the dam as a "Significant Hazard" due to the "potential for the loss of a few lives and some damage to property in the event the dam failed".[12]
21. The Commissioner has promulgated regulations in accordance with the provisions of Chapters 54 and 446j of the General Statutes pertaining to the classification of dams based upon their hazard potential. Pursuant to those regulations, the DEP has classified Packer's Pond Dam as a Class B dam.[13] Regs., Conn. State Agencies § 22a-409-2.
22. The dam has been the subject of inspections and assessments by the DEP and its predecessor (the Water Resources Commission) for more than thirty-four years. During this time, certain deficiencies observed in the dam have worsened to such an extent that these assessments of the overall condition of the dam have gone from good to fair to poor.
23. The interests of PW's predecessors in title, The New York, New Haven and Hartford Railroad Company, were also the subject of inspections and assessments by the Water Resources Commission and the railroad was asked to make certain repairs to the brick arch culvert and the stone walls in the channel. The railroad company, in response to requests from the Water Resources Commission, made repairs to the culvert headwall and shored up the stone walls.
24. In the most recent administrative Orders, the Commissioner found the following deficiencies: (1) the spillway crest and toe, and the toe of the training walls to the east and west of the spillway are undermined; (2) the dam embankment located on the southwest side of the spillway has an irregular cross section and an uneven crest elevation; (3) there is severe erosion at several locations; (4) the vertical walls of the sluiceway are in poor condition and are in imminent danger of failing; (5) trees and brush on the embankment need to be removed and the root systems grubbed; (6) a trash rack needs to be installed on the vertical lift gate; and (7) various maintenance deficiencies require attention such as re-pointing and re-chinking the masonry structures.
25. The structural integrity of the dam is in jeopardy because the dam cannot safely support the flows that will pass over the spillway CT Page 10236 during the 100-year frequency recurrence flood flow ("100-year storm event").[14] The DEP and the Army Corps of Engineers guidelines use a spillway design storm of this magnitude for dams that are classified as significant hazard dams.
26. The occurrence of a 100-year storm event will cause the dam to overtop because, due to the height of its spillway, the level of the water within the impound area will rise at a rate greater than the dam's capacity to pass that water over the spillway.
27. In the event the dam overtopped, damage could occur to: (1) the masonry conduit and training walls of the sluiceway; (2) the railroad embankment; (3) the brick arch culvert underneath the railroad embankment; (4) Packerville Road, including the bridge that spans Mill Brook, which is located a short distance downstream of the dam; and (5) any downstream structures that might incur flooding.
 * * *
Repairs to the Dam
28. In order to safely support the flows that would occur during a 100-year storm event, the spillway of the dam would need to be at such a height that there would be one foot of freeboard between the crest of the dam and the maximum water elevation during the storm. At present, the spillway is too high and it cannot support the anticipated flow of water during a 100-year storm event and retain the required one foot of freeboard.
8. All parties agreed that the repairs as set forth below would restore the dam to a safe condition and would satisfy the compliance requirements of the DEP:[15]
• Lower spillway by four feet
• Excavate soil on upstream side of spillway
• Rebuild spillway by pouring a one foot high concrete lip
• Clear and grub embankments
• Regrade embankments
• Seed and mulch embankments
• Adjust the vertical slopes to attain a ratio of 1:1 CT Page 10237
• Bed and lay 48" reinforced concrete pipe
• Seal both ends of pipe
• Backfill and compact granular fill around pipe
• Install fenced enclosure around Intake/Grate structure
• Chink and group openings in spillway and training walls
30. The majority of the areas that are in need of repair lie on portions of the dam that are owned by, or in control of; either of the respondents. The extent of either respondent's responsibility for any particular repair can be clearly determined based on the relative interests of each respondent in the effected portion of the dam as depicted on the Conklin and Meehan surveys.
(Citations to the record omitted) (Final Decision, pp. 4-13).
 Analysis of Plaintiff's Claims of Error
1. The Plaintiff's Claim that Gluck is Exclusively Obligated to Correct any Deficiencies in the Dam
The plaintiff makes several arguments pertaining to this claim of administrative error. It asserts that it does not have a legal responsibility to repair the dam because the DEP had issued numerous orders, pursuant to General Statutes § 22a-402[16], solely to Gluck as the person "owning or having control" of the dam. (Plaintiff's February 2, 2001 Brief; pp. 12 et seq.; Plaintiff's April 26, 2001 reply Brief.) These orders were issued in December 1977, July 1981, and January 1996. (Final Decision, pp. 2-3). Gluck has not complied with these orders.
The plaintiff maintains that "the fact that a portion of Packer Pond Dam is located within PW's easement boundary has not changed. In the absence of changing factual or legal circumstances, other than an alleged worsening of conditions, there is no basis for DEP to change its position that Gluck is the person owning and controlling Packer Pond Dam, in its entirety, for purposes of Conn. Gen. Stat. § 22a-402." (Plaintiffs February 2, 2001 Brief; p. 13). Further, the plaintiff contends that "DEP's issuance of the 1998 Order to PW, after more than twenty years of failing to enforce orders against Gluck, contravenes Conn. Gen. Stat. § 22a-406 and is in violation of DEP's statutory authority." (Plaintiffs February 2, 2001 Brief; p. 15). CT Page 10238
In connection with this claim, the plaintiff contends that "[i]naction on the part of Gluck and DEP has exacerbated and likely will continue to exacerbate the impaired condition of the sluiceway wall, including the portion of the wall within PW's easement boundary." (Plaintiffs February 2, 2001 Brief; p. 14). "If Gluck had responded to, and DEP had enforced, the 1977, 1981 and 1996 Orders, the alleged deficiencies in Packer Pond Dam may never have reached PW's easement boundary." (Plaintiffs February 2, 2001 Brief; p. 15; see also Plaintiff's April 26, 2001 Reply Brief; p. 1 et seq.).
The court finds this claim of error unpersuasive for several reasons. First, the plaintiffs reliance upon General Statutes § 22a-406 is misplaced.[17] A plain reading of that statutory provision reveals that its purpose is in part to shield the "the state, the Commissioner of Environmental Protection, or his employees or agents" from liability from injuries sustained by third parties as a result of a failure, in this instance, of the dam. General Statutes § 22a-406. Thus, it represents an example of the legislative codification of the legal principle of sovereign immunity. Further, it specifically provides that "no order, approval or advice of the commissioner, shall relieve any owner or operator of such a [dam] from his legal duties, obligations and liabilities resulting from such ownership or operation." General Statutes § 22a-406. These "legal duties" and "obligations" would include the requirement "to place [a dam] in a safe condition." General Statutes § 22a-402. Therefore, any previous DEP orders directed solely to Gluck would not relieve PW of its legal responsibilities and obligations if it owned or controlled a portion of the dam.
Secondly, the plaintiff is in essence attempting to assert a claim of estoppel against DEP. In this regard, it is "recognized that as a general rule, estoppel may not be invoked against a public agency in the exercise of its governmental functions." Kimberly-Clark Corporation v. Dubno,204 Conn. 137, 146 (1987). This general rule is tempered by a narrow exception.
 Under our well-established law, any claim of estoppel is predicated on proof of two essential elements: the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and the other party must change its position in reliance on those facts, thereby incurring some injury. . . . It is fundamental that a person who claims an estoppel must show that he has exercised due dingence to know the truth, and that he not only did CT Page 10239 not know the true state of things but also lacked any reasonably available means of acquiring knowledge. . . . In addition, estoppel against a public agency is limited and may be invoked: (1) only with great caution; (2) only when the action in question has been induced by an agent having authority in such matters; and (3) only when special circumstances make it highly inequitable or oppressive not to estop the agency.
(Citations omitted; internal quotation marks omitted). In re Michaela LeeR., 253 Conn. 570, 604 (2000). See also Holbrook v. Huntington Kildare, Inc., Superior Court, judicial district of Hartford, Docket No. 0548320 (September 17, 1996, Sheldon, J.). Additionally, "[a]n administrative agency, charged with the protection of the public interest, is certainly not precluded from taking appropriate action to that end because of mistaken action on its part in the past. . . . Nor can the principles of equitable estoppel be applied to deprive the public of the protection of a statute because of mistaken action or lack of action on the part of public officials. . . . The doctrine of equitable estoppel is not a bar to the correction by the Commissioner of a mistake of law." (Citations omitted; internal quotation marks omitted.) WilliamRaveis Real Estate, Inc. v. Commissioner of Revenue Services,44 Conn. Sup. 1, 7-8, affirmed 43 Conn. App. 744 (1995).
The court finds that imposition of estoppel in this instance would be contrary to General Statutes § 22a-406, which provides that "no order, approval or advice of the commissioner, shall relieve any owner or operator of such a [dam] from his legal duties, obligations and liabilities resulting from such ownership or operation." As stated above, previous DEP orders would not excuse PW from its obligations and responsibilities if it owned or controlled portions of the dam. Moreover, the record does not demonstrate that the plaintiff has satisfied the requirements necessary to invoke the narrow exception to estop a public agency.
Third, to constrain the DEP from enforcing an order against the person owning or having control of a dam would be contrary to express public policy upon which the statute in question is founded. General Statutes22a-1.[18] Furthermore, such constraint would contravene the express authority and responsibilities of the commissioner of the DEP to protect the public and environmental safety. General Statutes § 22a-401.[19]
"The commissioner of environmental protection has been given broad powers with reference to the protection of lakes, rivers and streams within the state." Cannata v. Department of Environmental Protection, 215 Conn. 616,625 (1990). "In Connecticut, the legislature has granted the department [of environmental protection] broad discretion to enforce the CT Page 10240 environmental laws." Cadlerock Properties v. Commissioner, supra,253 Conn. 670.
Fourth, the DEP is vested with the discretionary authority to determine when to enforce an order made pursuant to General Statutes § 22a-402. "If such order is not carried out within the time specified, the commissioner may carry out the actions required by the order. . . ." General Statutes § 22a-402. The use of the word "may" in lieu of "shall" connotes a discretionary act, not a mandatory duty. See generallyCarothers v. Ridge Development, Inc., Superior Court, judicial district of Hartford, Docket No. 374125 (November 9, 1990, Heiman, J.).
Fifth, any inaction on the part of DEP and Gluck that may have possibly exacerbated the deterioration of the dam within PW's easement boundary is irrelevant to a determination of the responsibility to make repairs for the purposes of General Statutes § 22a-402. The relevant issue in this administrative appeal is ownership and control not causation.
Accordingly, the court finds for the defendant, DEP, on this claim of error.
2. The Plaintiff's Claim that PW Neither Owns nor has Control over theDam
In part, the plaintiff maintains that "[b]uilding on erroneous conclusions as to law and fact, the Final Decision concludes that the Commissioner has jurisdiction over PW, who holds an easement for railroad purposes. . . . Certain portions of Packer Pond Dam, which predated the railroad's presence and which the Final Decision maintains require repair . . . are located within the boundaries of this limited easement. of paramount significance, there is no finding in the FinalDecision or, in fact, any evidence in the Record that would support any connection between the railroad's conduct in exercising its rights to use its right of way for railroad purposes and the conditions of Packer Pond Dam that the Hearing Officer concludes require repair or maintenance." (Emphasis in original; internal citations omitted) (Plaintiffs February 2, 2001 Brief; pp. 15-16).
Further, PW argues that "DEP impermissibly and without legal support equates PW's exclusive possession of an easement for railroad purposes, which gives PW the right and obligation to exclude others from the easement property to the extent safety requires, with control of Packer Pond Dam as required under Section 22a-402. . . . The fact that, because of this obligation on the part of PW to protect the public, including Gluck, Gluck may have to get the permission of PW to go on the property to perform work DEP might require within the easement CT Page 10241 boundary, does not transfer control of the dam to PW and thereby undo established law as to the limited scope of PW's interest." (Citations omitted) (Plaintiff's February 2, 2001 Brief; p. 22).
Regarding the evidence contained in the record, PW contends that the testimony and other evidence prepared by Attorneys Robert McCoy and Anita Coleman, as well as Ruth Ann Baird, a real estate title examiner, establishes its position that it does not own or control the dam. It contends that the evidence to the contrary supplied by Richard Meehan, a land surveyor, and Donald Ballou, a professional engineer, should be disregarded. "Wishful thinking by witnesses who are not lawyers and not trained in searching title records cannot create an ownership interest on the part of PW." (Plaintiffs February 2, 2001 Brief; p. 20).
The facts concerning the initial acquisition of the property are uncontroverted. The final decision sets forth in considerable detail the chain of title. (See Final Decision, Findings of Fact). Briefly stated, PW is the successor in interest to property obtained through a special condemnation proceeding legislatively enacted to permit a railroad company to construct and operate a rail line. It is also undisputed that portions of the dam are located within the railroad easement. Moreover, PW agrees that it has the authority by virtue of the ownership of the railroad easement to exclude others from entering upon the land within its boundaries. The DEP HO specifically determined that these portions of the dam include "(1) the east downstream spillway training wall; (2) the west downstream spillway training wall; (3) a portion of the spillway including the base or toe and spillway outlet channel; (4) the east and west dam embankments; (5) a west embankment lateral training wall; and (6) a portion of the sluiceway or sluice structure." (Final Decision, Finding of Fact number 18).
Finally, the DEP HO concluded that, for the purposes of General Statutes § 22a-402, it is "not unreasonable for the Commissioner to conclude that PW `owns' or has `control' of the property that lies within the boundaries of its easement." (Final Decision, p. 22).
In order to properly analyze this issue, an examination must be made of the interests in property held by PW and the meanings of "own" and "control" as they relate to real property and General Statutes §22a-402. This will be accomplished through a discussion of the relevant law and an examination of the substantial evidence in the record.
"The easement which a railroad acquires in its right of way is like that of a highway, in that it is for the use of the public. . . . It is one which has attached to it the incidents of exclusive occupations and enjoyment for the public use in a peculiar degree. . . . It possesses the CT Page 10242 feature of prospective permanence no less than does that of a highway." (Citations omitted). Center Bridge Co. v. Wheeler Howes Co.,86 Conn. 585, 589 (1913).
When the legislature authorizes the taking of private property by the railroad through condemnation, it "declare[s] the public use and the existence of a public necessity for the condemnation of land to such use, and then to confer on the individual, the board, or the corporation, the right to select the property which is to be appropriated to that use." New York, N.H. H.R.R. Co. v. Lone et al., 69 Conn. 424,435 (1897). "The interest, or estate, which a railroad corporation acquires in land taken by it for railroad purposes by condemnation is, and from the nature of the user must be, a right to the occupation of it, exclusive in point of user, and practically unlimited in point of duration. This right, while for many purposes it is substantially equivalent to the fee, is not the fee." Fitch v. New York, Prov. BostonR.R. Co., 59 Conn. 414, 419-420 (1890). "The railway company must, from the very nature of their operations, in order to the security of their passengers and workmen and the enjoyment of their road, have the right at all times to the exclusive occupancy of the land taken, and to exclude all concurrent occupancy by the former owners in any mode and for any purpose. It is obvious that the right of the railway to the exclusive occupancy must be for all the purposes of the roads much the same as that of an owner in fee." New York N.Eng.R.R. Co. v. Comstock, 60 Conn. 200,210 (1891). "Railroading is a dangerous business; the railroad company's right of way and tracks must be under its control; consideration for the safety of the public should forbid any save the railroad employees from being upon the tracks, and forbid any foreign uses of the railroad, trestles, its embankments, or way upon or below the surface of its tracks." New York, N.H. H.R. Co. v. Armstrong, 92 Conn. 349, 361
(1918).
Thus, the case law indicates that the nature and scope of a railroad easement is very broad and all-inclusive. It is unlimited in duration and, in many respects, particularly the ability to exclude others, substantially the equivalent of a fee simple interest.
Having determined the nature and scope of the plaintiffs interest in the property, the second question is whether General Statutes § 22a-402
encompasses that possessory interest. This Statute provides in part that if the "commissioner finds any [dam] to be in an unsafe condition, he shall order the person owning or having control thereof to place it in a safe condition. . . ." (Emphasis added) (General Statutes § 22a-402). The terms "own" or "control" are not defined in the statute. The court finds guidance in the opinions of our appellate courts. In this regard:
CT Page 10243 Our Supreme Court has ruled that [t]he term "owner" is one of general application and includes one having an interest other than the full legal and beneficial title. . . . The word owner is one of flexible meaning, and it varies from an absolute proprietary interest to a mere possessory right. . . . It is not a technical term and, thus, is not confined to a person who has the absolute right . . . but also applies to a person who has possession and control. . . . The word "control" has no legal or technical meaning distinct from that given in its popular acceptation . . . and refers to the power or authority to manage, superintend, direct or oversee.
(Citations omitted; internal quotation marks omitted). Doty v. ShawmutBank, 58 Conn. App. 427, 432 (2000); see also Kirby v. Zlotnick,160 Conn. 341 (1971); Panaroni v. Johnson, 158 Conn. 92 (1969); Bates v.Connecticut Power Co., 130 Conn. 256 (1943).
Finally, in our caselaw, the entity holding the easement has been identified as the "owner" of the easement. Lakeview Associates v.Woodlake Master Condominium Assn., Inc., 239 Conn. 769, 776 (1997);Center Drive-In Theatre, Inc. v. Derby, 166 Conn. 460, 464 (1974).
In the instant appeal, PW relies heavily on a portion of the administrative evidence to support its position that it neither owns nor controls any portion of the dam, while characterizing evidence to the contrary as "wishful thinking." The court's examination of the entire record discloses that there are substantial contradictions in the evidence on this critical issue. To illustrate this point, the record contains several legal opinions by attorney McCoy pertaining to the dam and the plaintiffs interest in it. These opinions are inconsistent. In a February 24, 1997 letter to DEP, attorney McCoy wrote that "Robert J. Gluck and his wife own the land upon which the largest part of the dam is situated however, the dam is on the land owned by the Providence and Worcester Railroad. . . . Not only should Mr. Gluck be subject to the DEP order to repair but the Providence and Worcester a respondent as well. . . ." (ROR, Gluck Exhibit 5). Thereafter, several months later in a second letter dated June 11, 1997 with attachments, attorney McCoy opined, in direct opposition to the first letter, that "I have done more research and have conclusively established that Robert Gluck is the owner of the dam on Packers Pond Road and his responsibility under the covenants in his deed are covenants running with the land which require Robert Gluck to maintain and repair Packer Pond Dam." (ROR, Gluck Exhibit 32). According to attorney McCoy, this second opinion was based upon a 1954 warranty deed from William Bramwell to Gluck's parents, which CT Page 10244 states, "it is further understood that the grantees, their heirs and assigns shall maintain the dam in proper working condition." (ROR, Gluck Exhibit 32).
In addition, the record contains a letter dated November 29, 1967, from the New York, New Haven Hartford Railroad Company, the predecessor in title to the easement in question, to the Director of the Water Resources Commission of the State of Connecticut "concerning conditions in vicinity of pond and dam" in question. (ROR, DEP Exhibit 15). In that letter, a representative of PW's predecessor identified as "Engineer, Maint. of Way" stated that it had performed various aspects of remedial work which included "a new concrete headwall has been completed at culvert no. 37.21 and the stone walls have been shored up." (ROR, DEP Exhibit 15).
It is clear that the DEP HO was presented with contradictory evidence, the determination of which required the exercise of judgment and discretion. This court is mindful that the "trial court may [not] retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact. Our ultimate duty is to determine, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion . . . Cadlerock Properties v. Commissioner, supra, 253 Conn. 669. Further, in Dore v. Commissioner of MotorVehicles, 62 Conn. App. 604, 610-611 (2001), as in the present case:
 The hearing officer . . . faced the dilemma of two diverse factual predicates. . . .
 Factual determinations of the commissioner must be upheld if there is substantial evidence in the record to support such a finding. . . . An administrative finding is supported by substantial evidence if the record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . Such a standard or review allows less room for judicial scrutiny than does the weight of the evidence rule or the clearly erroneous rule. . . . In determining whether an administrative finding is supported by substantial evidence, a court must defer to the agency's right to believe or disbelieve the evidence presented by any witness, even an expert, in whole or in part.
The court does not agree with PW's contention that the covenant, included in the 1954 warranty deed which purports to obligate Gluck to repair and maintain the dam, supercedes the statutory responsibility of CT Page 10245 "the person owning or having control" of a structure "to place it in a safe condition. . . ." General Statutes § 22a-402. To the contrary, PW's ownership of the railroad easement confers upon it a possessory right that is substantially equivalent to a fee simple interest. As previously discussed, PW readily acknowledges that it can control who can be physically present upon the land in which the easement encompasses. The interest held by PW is sufficient to fall under the duties and responsibilities imposed by General Statutes § 22a-402 for the protection of the public safety. Gluck's title interest does not absolve PW of their own obligations to the public, so as not to "endanger life and property . . ." by owning or controlling a dam which potentially is in an unsafe condition. General Statutes §§ 22a-40 1 and22a-402.
Finally, regarding PW's claim that its use of the easement did not contribute to the defects in the dam, the court has previously noted that the relevant issue to be determined for the purposes of General Statutes § 22a-402 is ownership and control not causation.
The court finds that, based upon the law and the substantial evidence in the record, the DEP HO's conclusion that PW owns or controls the portion of the dam within its easement boundaries is not unreasonable, arbitrary, illegal, or in abuse of its discretion.
3. The Plaintiff's Claim that the DEP Failed to Demonstrate that the Dam is in an Unsafe Condition
PW claims that "DEP has failed to demonstrate by a preponderance of the evidence" that the dam "is in an unsafe condition" and "DEP's own conduct over the past thirty years is inconsistent" with this claim. (Plaintiffs February 2, 2001 Brief, pp. 28 et seq.). The DEP HO in its final decision addressed the nature of the evidence on this issue as well as the DEP's decision not to "carry out the actions required" by the prior DEP orders to Gluck in December 1977, July 1981, and January 1996.
 The burden is . . . on the Commissioner to consider the unique structure of each dam and to assess whether it is in a safe condition within the context of that structure. . . . I have reviewed the record regarding the issue of whether the DEP sustained its burden of demonstrating that the dam is in an unsafe condition. The expert testimony on this issue is not clearly uncontroverted. The experts for PW and Gluck attempted to cast doubt on the probability that the dam would overtop during a 100-year storm event. However, neither offered any substantial and credible CT Page 10246 rebuttal evidence to prove that the dam could safely support the flows anticipated under the conditions of that well-established criteria which both experts endorsed. Furthermore, the record shows that these two experts agreed to the necessity of the repairs enumerated in the Commissioner's Orders and in the proposed repair plain proffered by Gluck's expert in order to make the dam safe.
 I have also reviewed the record with respect to PW's claim that the DEP's conduct over the past thirty years is inconsistent with a finding that this dam is unsafe. The record does show that the DEP and its predecessor investigated the dam in the past and that deficiencies in its structural integrity were identified on a number of occasions. The record is void of any evidence that the Commissioner has exercised his authority to enforce earlier administrative orders issued for the repair of this dam, or taken any action authorized by General Statutes § 22a-402 to have the dam restored to a safe condition. However, the authority granted to the Commissioner pursuant to § 22a-402, specifically that the Commissioner "may carry out the actions required by the order provided the [C]ommissioner has determined that an emergency exists which presents a clear and present danger to the public safety . . .", is permissive and not mandatory. (Emphasis added)
 Furthermore, the language of § 22a-402 does not specifically require that a dam actually be in imminent danger of failing so as to present a "clear and present danger to the public safety" before a determination can be made that it is in an unsafe condition. The provision merely empowers the Commissioner to act in those extreme circumstances.
 The record contains substantial facts from which it could reasonably be inferred that the dam is in an unsafe condition. . . . The engineers for all three parties agree that the repairs, as proposed to comply with the Orders, are necessary. The deficiencies in the structural integrity of the dam have worsened over time. There is substantial, albeit, contradicted evidence, that the dam will not be able to withstand the 100-year storm event. However, even if it were CT Page 10247 possible to arrive at two inconsistent conclusions based upon any contradictory evidence in the record concerning the condition of the dam, there is sufficient evidence to support a finding that the dam is unsafe and that the issuance of the repair order was proper under the circumstances. (Citations omitted) (Final Decision, pp. 15-17).
The DEP HO concluded that the dam was not in safe condition because it would overtop during a 100-year frequency storm event. This safety standard has been applied by the DEP on prior occasions. Kish v. Cohn,59 Conn. App. 236, 238 (2000). The court s review of the entire administrative record reveals that the DEP HO received a substantial amount of evidence on the use of the dam safety. This evidence consisted of the testimony of various witnesses and a quantity of exhibits. (See e.g. DEP Exhibits Numbers 4, 5, 6). In pursuing its defense before the agency, PW argued that DEP's failure to address the purported dangerous conditions and force Gluck to perform corrective work was inconsistent with the position that the dam was unsafe.
The limited role of the court is to determine whether substantial evidence exists in the record to support the DEP HO's findings of facts and conclusions. "The question is not whether the trial court would have reached the same conclusion but whether the record before the [FHO] supports the action taken." Hospital of St. Raphael v. Commission onHospitals and Health Care, 182 Conn. 314, 318 (1980).
 . . . [T]he trial court may [not] retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact. . . . Our ultimate duty is to determine, in view of all the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . The substantial evidence rule governs judicial review of administrative fact-finding under the UAPA. General Statutes § 4-183(j)(5) and (6).
(Citations omitted; internal quotation marks omitted.) CadlerockProperties v. Commissioner, supra, 253 Conn. 676-77. As noted above, the court must also defer to the DEP HO's "right to believe or disbelieve the evidence presented by any witness, even an expert. . . ." Dore v.Commissioner of Motor Vehicles, supra, 62 Conn. App. 611.
The court's examination of the entire administrative record reveals that the record contains the requested substantial evidence necessary to CT Page 10248 support the DEP HO's findings of fact and conclusions that the dam is unsafe for the purposes of General Statutes § 22a-402. It is very evident from the text of the final decision that the DEP HO weighed and evaluated all of the evidence. In so doing, the DEP HO was entitled to make reasonable inferences from the substantial evidence within the record. In this regard, the DEP HO expressly stated that "[t]he experts for PW and Gluck attempted to cast doubt on the probability that the dam would overtop during a 100-year storm event. However, neither offered any substantial and credible rebuttal evidence to prove that the dam could safely support the flows anticipated under the conditions of that well established criteria which both experts endorsed." (Final Decision, p. 15)
Moreover, regarding DEP's failure to act, the DEP HO found that the agency had investigated and identified deficiencies in its structural integrity, but its failure to take further action is within the discretionary authority of the commissioner as provided in General Statutes § 22a-402 (See Final Decision, p. 16). The court does not take issue with this interpretation of the law, and the commissioner's authority under it.
Accordingly, based upon the foregoing, the court finds for the defendant on this claim of error.
4. The Plaintiff's Claim that the Final Decision Incorrectly Apportioned Responsibility for Repairs Based Upon PW's Easement Boundary, and Ignores Gluck's Pre-existing Obligations to Repair the Dam
PW argues that "[t]he Final Decision apportions the responsibility for repairs to [the d]am based on [its] easement boundary, with [it] being assigned full responsibility for repairing the portion of [the d]am that falls within the boundary of PW's easement." (Emphasis in original.) (Plaintiffs February 2, 2001 Brief; pp. 32-33.) "This apportionment is inherently flawed, in that it ignores Gluck's pre-existing obligations to repair Packer Pond Dam, including the portion in PW's easement, under the 1977, 1981 and 1996 Orders. To reward Gluck for his twenty years of inaction in response to DEP Orders is not only contrary to fundamental standards of fairness, it is also contrary to law and the evidence in the record." (Plaintiffs February 2, 2001 Brief; p. 33.)
The DEP HO addressed the issue by stating in relevant part:
 General Statutes § 22a-6a(b) provides for a finding of joint and several liability among multiple respondents when a reasonable apportionment of CT Page 10249 responsibility is not possible. Where, however, there is a reasonable basis for apportionment of responsibility among multiple respondents, a finding of joint and several liability should not be made.
* * *
 I have reviewed the record and the apportionment theories proffered by each respondent and find that there is sufficient evidence to arrive at a reasonable allocation of responsibility for the repairs to each respondent based upon the location of PW's easement boundaries relative to the work required.
(Citation omitted) (Final Decision, p. 26) (See also ROR, Finding of Fact 30).
General Statutes § 22a-6a provides in relevant part: "[w]henever two or more persons knowingly or negligently violate any . . . order . . . adopted or issued . . . by the commissioner and responsibility for the damage caused thereby [that] is not reasonably apportionable, such person shall, subject to a right of equal contribution, be jointly and severally liable. . . ." In Connecticut Building Wrecking Co.v. Carothers, 218 Conn. 580, 606-607 (1991), the court initially indicated "that § 22a-6a(b) appears to be addressed to suits for damages brought by the commissioner, not to the propriety of remedial orders issued by the commissioner. . . . [W]e conclude, however, that the legislature did not intend by its enactment to preclude application of the common law principal of joint and several liability in the context of remedial orders." (Footnote omitted.)
The court next addressed circumstances under which the administrative order imposing joint and several liability would be appropriate.
 . . . the trial court should determine whether the agency ever addressed the issue of combined or alternative causes for the environmental harm caused and made the requisite findings necessary for imposing upon the plaintiffs responsibility for cleaning up the waste deposited by other dumpers. Only in the event that there is no reasonable basis for apportionment of the damages caused to the environment among those whose illegal activities have contributed to such harm would joint and several liability be appropriate.
(Citations omitted.) Id., p. 609. CT Page 10250
The DEP HO in an examination of the record, determined that it did support a reasonable basis for apportionment of responsibility for repairs based upon the location of PW's easement boundary. In commenting upon the evidence the DEP HO noted that the parties presented "evidence which was intended to provide a reasonable basis for apportionment . . . Both . . . based their apportioned responsibilities on the percentage of work required on either side of the PW easement boundary line. . . . Gluck also presented evidence based upon the benefits derived by each respondent . . . based upon the location of PW's easement boundaries relative to the work required." (Citation omitted.) (Final Decision, p. 26.)
The court, having examined the entire record, finds that it contains substantial evidence upon which the DEP HO could reasonably conclude that an apportionment of responsibilities for repairs between PW and Gluck could reasonably be based upon the location of PW's easement boundaries. This conclusion is consistent with the applicable law.
Accordingly, the court finds for the defendant on this final claim of error.
 CONCLUSION
For all the foregoing reasons, the court finds for the defendant on all claims of error. Accordingly, the appeal is ordered dismissed.
BY THE COURT
PETER EMMETT